IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
Civil Action No. 3:18-cv-113

NEW YORK LIFE INSURANCE
COMPANY,

                      Plaintiff,

vs.

CYNTHIA L. McCULLOUGH,

                      Defendant.

**COMPLAINT**

Pursuant to Rule 3 of the Federal Rules of Civil Procedure, Plaintiff New York Life Insurance Company ("New York Life" or "the Company"), files this Complaint and alleges the following:

## INTRODUCTORY STATEMENT

This matter concerns a long-term care insurance policy issued by New York Life to Defendant Cynthia L. McCullough ("McCullough"). In this action, New York Life is seeking a declaratory judgment that McCullough is not qualified for continued benefits under the policy and was not qualified for benefits that she received under the policy for an additional period of time. New York Life seeks to recover benefits previously paid to McCullough based on erroneous and inaccurate information regarding her entitlement to benefits under the policy.

## THE PARTIES

1. Plaintiff New York Life is a mutual insurance company organized and existing under the laws of the State of New York, and its principal place of business is located in the State of New York.

2. Defendant McCullough is a natural person who is, upon information and belief, a United States citizen and also is a citizen of, resides in, and is domiciled in, Mecklenburg County, North Carolina.

## STATEMENT OF JURISDICTION & VENUE

3. This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332. For purposes of determining jurisdiction, Plaintiff New York Life is considered a citizen of New York, *see* 28 U.S.C. § 1332(c)(1), and McCullough is considered a citizen of North Carolina, *see Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 828 (1989). Thus, there is complete diversity of citizenship between the parties. As will be shown below, the amount in controversy in this action, exclusive of interest and costs, exceeds $75,000. In particular, long-term care benefits brought into question by this action exceed the sum of $75,000, including previously paid benefits which New York Life seeks to recover from McCullough. Accordingly, this Court has subject matter jurisdiction over this case.

4. This Court has personal jurisdiction over McCullough because, among other things, McCullough is domiciled in the State of North Carolina, this action arises out of a contract of insurance made between New York Life and McCullough, and the events out of which New York Life's claims arise occurred within North Carolina. *See* N.C. Gen. Stat. § 1-75.4.

5. This Court is the proper venue for this case. McCullough, who is the only Defendant in this case, is a resident of Mecklenburg County, North Carolina, which is located in the Charlotte Division of the Western District of North Carolina. As already alleged, McCullough is subject to this Court's personal jurisdiction. Accordingly, venue is proper in this Court under 28 U.S.C. § 1391.

2

## BACKGROUND

### *New York Life issued a long-term care insurance policy to McCullough*

6. Long-term care insurance policies, like the one at issue in this case, reimburse policyholders a daily amount (up to a maximum limit) for services to assist them with activities of daily living, such as bathing, dressing, or eating, when the policyholders are unable to perform those activities on their own. The policies are designed to cover services and support, including personal and custodial care in a variety of settings, such as the insured's home, an assisted living facility, or a nursing home.

7. In 2002, New York Life issued a Comprehensive Long-Term Care Insurance Policy to McCullough with a policy number ending in 7701 and a policy effective date of November 24, 2002 (the "Policy").

8. A copy of the Policy is attached to this Complaint as **Exhibit A** and is hereby incorporated by reference. It is a true and accurate copy of the Policy, save and except for the redaction of all but the last four digits of the policy number.

9. Subject to its terms, conditions, and limitations, the Policy provides, among other benefits, a Home and Community-Based Care Benefit. Specifically, the Policy provides in pertinent part that New York Life "will pay a benefit for each day that . . . [McCullough] receive[s] services from a *Home Health Agency*," consisting of "[t]he *Eligible Charges* made by the *Home Health Agency* . . . for the services provided on that day; up to [t]he Home and Community-Based Care Maximum Daily Benefit shown on . . . [McCullough's] Schedule of Benefits." The Policy's Schedule of Benefits provides, in turn, that the Home and Community-Based Care Maximum Daily Benefit is $273.65, with no lifetime maximum.

10. McCullough must meet certain specific eligibility requirements to receive the Home and Community-Based Care Benefit under the Policy.

3

11. The Policy provides that McCullough will be eligible for benefits only when New York Life determines, among other things, that McCullough:

- is "unable to perform without continual substantial assistance from another individual 2 or more of the following 6 *Activities of Daily Living [ADLs]: Dressing, Eating, Continence, Toileting, Transferring, and Bathing* due to a loss of functional capacity;" or

- has "suffered a *Severe Cognitive Impairment*."

12. To be eligible for benefits under the Policy, McCullough also must:

- "have been certified, within the past twelve months as a *Chronically Ill Person* by a *Licensed Health Care Practitioner;*" and

- "have a *Plan of Care* which prescribes the types of care, services or supplies for which . . . [McCullough] claim[s] benefits."

13. The Policy defines a "Chronically Ill Person" as "an individual who has been certified within the preceding 12 months by a *Licensed Health Care Practitioner*" as:

- "Being unable to perform, without substantial assistance from another individual, at least 2 *Activities of Daily Living* due to a loss of functional capacity which is expected to last at least 90 days;" or

- "Requiring substantial supervision to protect oneself or others from threats to health and safety due to *Severe Cognitive Impairment*."

14. The Policy defines "Cognitive Impairment" as "loss or deterioration of intellectual ability determined using standard reliable tests and clinical evidence demonstrating impairment in one or more of the following areas: Deductive and abstract reasoning; Orientation to person, place and time; and Short- or long-term memory."

4

15. To determine whether McCullough is eligible for benefits, the Policy provides that New York Life "may perform an *Assessment*," which is defined as "an evaluation to determine or verify the degree of loss of . . . [McCullough's] functional capacity or cognitive ability at the time of claim." The Policy stipulates that New York Life will pay for any such Assessments, and McCullough "must . . . cooperate with . . . [New York Life] in performing the *Assessment*."

16. Under the Policy, when New York Life requests an Assessment, the Company may perform the Assessment or may use a Care Advisor. A "Care Advisor" is "an organization or individual designated by . . . [New York Life]" that is also "a *Licensed Health Care Practitioner* whose profession and training includes experience in managing and arranging for Long-Term Care Services, or an organization that includes such health care professionals."

17. Assessments to verify eligibility for benefits may include physical examinations, which New York Life may conduct as often as it deems reasonable. The Policy provides that New York Life "may examine . . . [McCullough] or request the *Care Advisor* to perform an *Assessment* of . . . [McCullough] when and as often as . . . [New York Life] deem[s] reasonable before paying any benefit." The Policy further provides that, "[a]ny such examination or *Assessment* will be at our expense," and that McCullough "must cooperate with the examination or *Assessment*."

18. Finally, the Policy further provides in part that, if New York Life "make[s] payments with respect to benefits in a total amount which is, at any time, in excess of the benefits payable under the provisions of this Policy, . . . [New York Life] will have the right to recover such excess from [McCullough] . . . or from any persons or providers to, or for, or with respect to whom, such payments were made. [New York Life] . . . may withhold future benefit payments in order to do so."

### *New York Life begins paying benefits to McCullough*

19. In April 2010, McCullough submitted to New York Life a claim for Home and

5

Case 3:18-cv-00113   Document 1   Filed 03/09/18   Page 5 of 20

Community-Based Care Benefits under the Policy, including a proposed plan of care and statement from a home health care provider and a doctor suggesting that she needed assistance with three ADLs: transferring, bathing, and dressing.

20. Based on representations made and documents submitted by McCullough in September 2010, McCullough's claim was approved, effective April 20, 2010, and New York Life began reimbursing Home and Community-Based Care Benefits to McCullough in November 2010. To date, New York Life has paid McCullough benefits in the amount of $389,479.00 under this claim.

*New York Life attempts to confirm McCullough's continued eligibility for Policy benefits*

21. As part of its confirmation of McCullough's continued eligibility for benefits, New York Life commissioned an in-home benefit eligibility interview of McCullough on December 21, 2016, and a registered nurse interviewed McCullough at McCullough's home.

22. McCullough reported that she needed the assistance of another person with two of the six ADLs: dressing and bathing.

23. With respect to dressing, McCullough complained of low back pain when bending forward to touch her toes, claimed she needed assistance from a caregiver to dress herself and noted that she required occasional assistance with putting pants, socks, and shoes on when her pain was severe. McCullough claimed she needed help because of weakness, limited mobility, an inability to bend/reach areas, fear of falling, loss of range of motion, unsteadiness, pain in her lower back, right leg, and foot, and numbness in her right foot.

24. McCullough claimed she was unable to bathe her entire body independently, needed assistance from another person when bathing—specifically washing her back, feet, legs, and arms—and would wait until her caregiver was present before bathing. McCullough attributed her inability to bathe herself to weakness, limited mobility, inability to bend and reach areas, fear

6

of falling, loss of range of motion, unsteadiness, pain in her lower back, right leg, and foot, and numbness in her right foot.

25. McCullough reported that she did not need assistance from another person with four of the six ADLs: eating, transferring, toileting, or continence. Additionally, the nurse recorded that McCullough was not cognitively impaired.

26. Following the December 2016 interview, New York Life continued to reimburse McCullough for her submitted home care expenses.

*Surveillance reveals McCullough does not need substantial assistance with any ADLs*

27. From December 30, 2016 through January 1, 2017, New York Life conducted surveillance of McCullough.

28. The surveillance captured McCullough performing various activities in a manner inconsistent with her representations to New York Life and her presentation during the benefit eligibility interview.

29. While under surveillance, McCullough moved freely without any apparent sign of hesitation or restriction and without the use of any visible support devices. Surveillance video revealed McCullough walking with a normal gait in and out of a church and her home independently, without the assistance of another person or the use of a cane. It showed her lifting her arms while putting various items into her SUV and taking them out. McCullough was able to bend at the waist and place things into the car's backseat. The surveillance video further revealed McCullough was able to bend down and pick an item up off of the ground and was able to carry a large handbag and several other items using both arms. McCullough was able to open and close doors using both hands and arms.

30. Surveillance also revealed that McCullough was able to drive independently for a distance of approximately 50 miles, from her home in Charlotte to a church in Rutherfordton,

7

North Carolina, where she apparently served as a pastor.

31. Additional investigation revealed that McCullough's church had posted photographs of her on the church's publicly accessible Facebook page on December 31, 2016, showing McCullough sliding down a large, inflatable slide, and playing skee ball—an arcade game that requires participants to bend over and roll balls up an inclined lane. The photos are below:



*An independent doctor concludes
McCullough does not need substantial assistance performing ADLs*

32. In February 2017, New York Life requested that Dr. Judy Emanuel, an independent doctor of osteopathic medicine, perform a peer review of McCullough's claim file to determine her benefit eligibility.

33. Dr. Emanuel noted, among other things, that there was no documentation that McCullough's upper extremity strength or range of motion was impaired or any reason

8

McCullough should have difficulty washing and drying her back. Dr. Emanuel further noted that McCullough's ability to carry packages in both hands using both arms and her ability to get in and out of her car should allow McCullough to get into a shower and sit on a shower chair.

34. With respect to McCullough's ability to dress herself, Dr. Emanuel noted that McCullough's ability to pick up an item from the ground and bend at the waist to put items in her car and get into a car independently suggested that there was no reason why McCullough could not put on and take off shoes and socks.

35. Finally, Dr. Emanuel noted that McCullough was seen standing and ambulating on surveillance with a normal gait and without any type of adaptive equipment.

36. Consequently, Dr. Emanuel concluded that, "[t]here is no evidence to suggest that the patient requires the assistance of a caregiver for functional activities of daily living."

*Additional surveillance of McCullough confirms*
*McCullough does not need substantial assistance performing ADLs*

37. For a 15-day period from May 22, 2017 through June 5, 2017, New York Life conducted additional surveillance of McCullough.

38. Once again, the surveillance captured McCullough performing various activities in a manner inconsistent with her representations to New York Life and her presentation during the benefit eligibility interview.

39. On a single day during this second period of surveillance, McCullough ran a series of errands by herself, driving to a doctor's office, a bank, two restaurants, and a gas station, where she pumped her own gas. On two other occasions during the surveillance period, McCullough once again traveled by herself to and from Rutherfordton, North Carolina, to attend church. During the surveillance period, McCullough was able to move freely, without restriction, and without the assistance of another person, opening and closing the doors of her SUV, bending down from the

9

driver's seat of her car to change her shoes by herself, and moving various items in and out of her car.

40. The below photographs from the second period of surveillance provide additional evidence of McCullough's physical activities:








10






*New York Life discontinues payment of benefits to McCullough*

41. On July 6, 2017, New York Life advised McCullough that, based on the medical records the Company had received from McCullough's doctors, the video footage of her movement in the community, and the results of Dr. Emanuel's review, it was apparent McCullough did not meet the Policy's requirements for benefit eligibility. Consequently, New York Life advised McCullough that the Company was discontinuing her benefits, but offered McCullough an opportunity to participate in an Independent Medical Examination ("IME").

42. On or about July 13, 2017, McCullough sent New York Life a letter appealing the Company's decision. In her letter, McCullough claimed to be suffering from reflex sympathetic dystrophy, which she characterized as "severe and debilitating." She suggested that New York Life consult records from two other doctors—her primary care physician and her podiatrist.

11

McCullough contended that she was "chronically ill," and that her "condition is deteriorating." Finally, McCullough claimed she "require[d] the assistance of an aid [sic] in order to continue to safely live in my home" and she "must have the services of a care aid [sic] for a substantial portion of the day."

43. In a phone call on or about September 28, 2017, McCullough confirmed the list of healthcare providers from whom New York Life should seek updated records. New York Life obtained those records in anticipation of McCullough's IME.

*An independent medical examination confirms
McCullough does not require substantial assistance performing ADLs*

44. On December 15, 2017, Thomas R. Saullo, M.D., conducted an IME of McCullough, examining her in person and reviewing her claim file, including updated surveillance footage taken of her. Some of the photos from the updated surveillance are below:





45. Notwithstanding that the surveillance video showed McCullough frequently traveling to various places, McCullough told Dr. Saullo that she spent most of her days watching TV and was not able to get out much due to her condition. She claimed that she rarely drove and when she did drive, it was for a short trip to the pharmacy. She told Dr. Saullo that she required an aide for four hours per day, six days a week.

46. McCullough told Dr. Saullo that she needed hands-on assistance with bathing and specifically that she needed a certified nursing assistant to wash and dry her feet and back. Dr. Saullo found, however, that McCullough demonstrated the range of motion and flexibility to reach her feet and behind her back. Consequently, he concluded that McCullough's statements were not consistent with his own clinical findings.

47. McCullough also told Dr. Saullo that some days she needed a certified nursing assistant to help her put on underwear. Dr. Saullo found, however, that McCullough had the necessary range of motion to reach her toes and should not need assistance to put on underwear. Thus, Dr. Saullo again found McCullough's statements to be inconsistent with his own clinical findings.

48. Dr. Saullo noted that the surveillance video of McCullough showed she had the capacity to carry various items, including grocery bags, that she was able to stand for extended periods of time with no obvious difficulty, and that she could stand, bend, and reach unassisted. He further noted that McCullough was able to sit on the side of her SUV and change out of a boot and into a normal shoe. Dr. Saullo observed that McCullough could, without difficulty, ascend and descend curbs and ramps and get into and out of her SUV.

49. McCullough told Dr. Saullo that she did not need assistance with four ADLs—eating, toileting, transferring, and continence—and Dr. Saullo determined that this was consistent with his clinical findings.

50. Dr. Saullo concluded McCullough was feigning or exaggerating functional deficits.

51. Dr. Saullo stated that it was his opinion, "based on . . . [McCullough's] exam on 12/15/2017 as well as extensive record and video review, that although Mrs. McCullough has multiple medical conditions, some of which result in musculoskeletal pain, she is independent with all ADL's and does not require a home aide for completion of her ADL/s [sic]."

52. Accordingly, New York Life recently advised McCullough that the Company was denying her appeal.

### *Certain invoices submitted by McCullough for reimbursement for care allegedly received are inconsistent with surveillance*

53. Based on surveillance of McCullough and McCullough's home, New York Life believes that a caregiver was not present to provide assistance to McCullough during the hours for which McCullough reportedly received care on at least the following dates: December 30, 2016; December 31, 2016; May 22, 2017; May 27, 2017; May 28, 2017; May 30, 2017; May 31, 2017; June 1, 2017; June 2, 2017; June 3, 2017; June 4, 2017; and June 5, 2017. Nevertheless, McCullough submitted invoices to New York Life for reimbursement for care she claims she received from a caregiver on those dates.

54. New York Life now believes that McCullough was not entitled to some or all of the benefits already paid to her and that McCullough provided inaccurate information to New York Life in order to obtain benefits under the Policy to which she was not entitled.

## FIRST CLAIM FOR RELIEF
**Declaratory Judgment**

55. New York Life incorporates by reference and re-alleges the preceding paragraphs of this Complaint.

56. As shown above, in order to be eligible to receive benefits under the Policy, McCullough must demonstrate, among other things, that she is unable to perform at least two of six Activities of Daily Living without continual substantial assistance from another individual.

57. As also shown above, New York Life has the right under the Policy to withhold benefits, if any, that McCullough might be entitled to receive under the Policy in the future, in order to offset benefit payments that were previously paid to McCullough and exceeded the benefits payable under the Policy, to the extent that McCullough does not reimburse those payments through other sources.

58. In this case, surveillance has shown and two independent doctors have confirmed that McCullough can, in fact, perform all six Activities of Daily Living without continual substantial assistance.

59. New York Life likewise now believes McCullough is not now and has not been a Chronically Ill Person and McCullough did not—and still does not—require substantial assistance in performing the ADLs, even though she must, among other things, require such assistance to qualify for benefits under the Policy.

60. Consequently, McCullough is not currently entitled to benefits under the Policy, and New York Life believes she may not have been entitled to benefits that she previously received under the Policy.

61. Nevertheless, McCullough maintains that she is entitled to benefits under the Policy.

15

62. There is an actual dispute and controversy between New York Life and McCullough of sufficient immediacy and reality to warrant the issuance of a declaratory judgment in this case.

63. Pursuant to 28 U.S.C. §§ 2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure, New York Life is entitled to a declaratory judgment that:

    a. McCullough was not qualified to receive the Policy's Home and Community-Based Care Benefit;

    b. McCullough is not now entitled to receive the Policy's Home and Community-Based Care Benefit; and

    c. New York Life is entitled to withhold benefit payments, if any, that McCullough might become entitled to receive in the future in order to offset those benefits that were previously paid to McCullough even though she was not entitled to them, to the extent she has not by that time reimbursed New York Life for those benefits.

## SECOND CLAIM FOR RELIEF
**Breach of Contract**

64. New York Life incorporates by reference and re-alleges the preceding paragraphs of this Complaint.

65. The Policy is a valid and binding contract between New York Life and McCullough.

66. Based on McCullough's misrepresentations, New York Life has paid McCullough benefits to which she was not entitled under the Policy.

67. McCullough incorrectly claims she was entitled to the benefits paid to her.

68. As alleged above, the Policy specifically gives New York Life the right to recover from McCullough (among other persons) any amounts paid in excess of the benefits payable under the provisions of the Policy.

69. McCullough's receipt and retention of the benefits paid to her constitutes a breach of the Policy.

70. In addition, North Carolina law imposed on McCullough an implied duty to do and perform those things that should be done in order to carry out the purposes for which the Policy was made and not to do anything that would injure New York Life's right to receive the benefits of the parties' contract.

71. McCullough was obligated to act in good faith, to make reasonable efforts to perform her obligations under the Policy, to act upon principles of fair dealing to accomplish the Policy's purposes, and to adhere to the Policy's presuppositions for meeting those purposes.

72. As the facts alleged above show, McCullough did not act in good faith and did not make reasonable efforts to perform her obligations under the Policy. Nor did she act upon principles of fair dealing to accomplish the Policy's purposes or adhere to the Policy's presuppositions for meeting those purposes.

73. Thus, McCullough also breached the implied covenant of good faith and fair dealing that the law of North Carolina implied into the Policy.

74. McCullough's breaches of the Policy have caused New York Life to incur damages.

75. Accordingly, New York Life is entitled to recover a judgment against McCullough for the amounts it paid to her in excess of the benefits payable under the Policy, plus all of the pre-judgment and post-judgment interest that accrues on those amounts.

### THIRD CLAIM FOR RELIEF
**Money Had and Received / Unjust Enrichment**

76. New York Life incorporates by reference and re-alleges the preceding paragraphs of this Complaint.

77. In the event the Court determines New York Life is not entitled to recover damages from McCullough for breach of contract, New York Life is, alternatively, entitled to recover such damages in equity.

78. By making the payments to McCullough, New York Life conferred a measurable benefit on her.

79. McCullough consciously and voluntarily accepted the payments made to her by New York Life, knowing she was not entitled to them and after having a realistic opportunity to refuse or return the payments.

80. New York Life did not make the payments to McCullough officiously or gratuitously.

81. New York Life made the payments to McCullough based on her misrepresentations.

82. If McCullough were allowed to keep the payments from New York Life, she would be unjustly enriched at New York Life's expense. It would be inequitable to allow McCullough to keep the payments under the circumstances.

83. Accordingly, in the event the Court determines that New York Life is not entitled to recover the payments under the terms of the Policy, New York Life is entitled in the alternative to recover a judgment in equity based on money had and received and/or the doctrine of unjust enrichment and/or general principles of equity holding McCullough liable for the damages caused by her receipt and retention of the payments New York Life made to her, including, but not limited

to, the amount of the payments, plus all pre-judgment and post-judgment interest owed on that amount.

## PRAYER FOR RELIEF

Plaintiff New York Life Insurance Company respectfully requests that the Court:

1. Enter a judgment against Defendant Cynthia L. McCullough:

    a. declaring that

        i. Defendant was not qualified to receive the Policy's Home and Community-Based Care Benefit;

        ii. Defendant is not now entitled to receive the Policy's Home and Community-Based Care Benefit; and

        iii. Plaintiff is entitled to withhold benefit payments, if any, that Defendant might become entitled to receive in the future in order to offset those benefits that were previously paid to Defendant even though she was not entitled to them, to the extent she has not by that time reimbursed Plaintiff for those benefits; and

    b. holding Defendant liable for all of the damages alleged above plus all pre-judgment and post-judgment interest that accrues on those damages;

2. Tax the costs of this action to Defendant; and

3. Award such other and further relief to Plaintiff as the Court deems just and proper.

19

This, the 9th day of March, 2018.

        NELSON MULLINS RILEY & SCARBOROUGH LLP

        By: s/Thomas G. Hooper
            Thomas G. Hooper
            N.C. State Bar No. 25571
            Ramona Farzad
            N.C. State Bar No. 46013
            301 South College Street, Suite 2300
            Charlotte, North Carolina 28202
            Telephone: (704) 417-3000
            Facsimile: (704) 377-4814
            E-Mail: tom.hooper@nelsonmullins.com
            E-Mail: mona.farzad@nelsonmullins.com

            *Attorneys for Plaintiff*